UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAQUAN J. CRITTENDON,

      Plaintiff,                    Civil Action No. 15-13845
                                   Honorable John Corbett O'Meara
          v.                   Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

      Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 12, 16]

Plaintiff Baquan Crittendon appeals a final decision of defendant Commissioner of Social Security ("Commissioner") denying his application for supplemental security income benefits ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After a hearing on October 17, 2016 and a review of the evidence, the Court finds that the administrative law judge ("ALJ") committed no more than harmless error in finding Crittendon not disabled, and thus **RECOMMENDS**:

- **GRANTING** the Commissioner's motion for summary judgment [R.

16];

- **DENYING** Crittendon's motion [R. 12];[1] and

- **AFFIRMING** the Commissioner's decision, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Crittendon's Background and Disability Application

Crittendon received supplemental security income benefits as a child due to ADHD and a learning disability. [R. 10-4, Tr. 53]. He is a high-school graduate, but was in special education since the third grade. [R. 10-7, Tr. 179]. Crittendon turned eighteen on May 12, 2011, and was notified that he was found no longer disabled as of March 31, 2012, based on a redetermination of disability under the rules for adults who file new applications. [R. 10-4, Tr. 53; R.10-2, Tr. 18].

Crittendon filed a new claim for benefits and was denied, so he filed a request for an administrative hearing. [R. 10-4, Tr. 80]. The ALJ held a hearing on February 24, 2014, during which Crittendon and a vocational expert ("VE") testified. [R. 10-2, Tr. 29-49]. In an April 14, 2014, written decision, the ALJ found Crittendon not disabled. [*Id.*, Tr. 24]. The Appeals

---

[1] In addition to their motions for summary judgment, the parties filed supplemental briefs. [R. 22; R. 23].

Council denied review, making the ALJ's decision the final decision of the Commissioner. [*Id.*, Tr. 1-5]. Crittendon timely filed for judicial review. [R. 1, PgID10-12].

### B.   The ALJ's Application of the Disability Framework

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps. First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 416.920(a)(4). Second, if the claimant has not had a severe impairment or a combination of such impairments[2] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its

---

[2] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." § 920(c).

assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994). [3]

Applying this framework, the ALJ concluded that Crittendon was not disabled. First[4], she found that Crittendon had the severe impairments of cognitive disorder, speech and language delays, attention deficit disorder, and oppositional defiance disorder. [R. 10-2, Tr. 18].  Next, the ALJ concluded that Crittendon's severe impairments did not meet or equal the severity of the listed impairments. [*Id.*, Tr. 19].

The ALJ then found that Crittendon had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but

---

[3] Opinions analyzing applications for Disability Insurance Benefits are applicable because the same standards apply to SSI claims.  *See* 20 C.F.R. §§ 404.1520 and 416.920.

[4] Normally, the ALJ first determines whether the claimant is performing substantial gainful activity, 20 C.F.R. § 416.920(a)(4)(i), but this step is omitted when re-determining disability after the plaintiff's eighteenth birthday.  20 C.F.R. § 416.987(b).

with the following non-exertional limitations of no climbing of ropes, ladders, or scaffolds; and no exposure to hazardous machinery or unprotected heights.  The ALJ further limited Crittendon to unskilled work with simple, routine tasks; no production rate work; no more than occasional interactions with general public, coworkers, supervisors; and no tandem tasks required. [*Id.*, Tr. 20].  At the fourth step, the ALJ found that Crittendon had no past relevant work. [*Id.*, Tr. 23].

After considering Crittendon's age, education, work experience RFC, and the testimony of the VE, the ALJ determined that he was able to perform work in the national economy, and was not disabled.  [*Id.*, Tr. 24].

## II.   ANALYSIS

### A.

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted).  Only the

5

evidence in the record below may be considered when determining whether the prior decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723. *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). The ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not

6

harmless. *Id.*; *Gentry*, 741 F.3d at 723, 729; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011).

Crittendon argues that the ALJ's decision that he did not meet paragraphs B and C of Listing 12.05 is not supported by substantial evidence.  The Court disagrees.

## B.

Section 12.05 provides in relevant part:

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .

B. A valid verbal, performance, or full scale IQ of 59 or less;

or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 40m Subpart P, App'x 1, § 12.05.  For reasons described below, the Court finds that the ALJ committed no error in finding that Crittendon does not have a valid IQ within the 60 to 70 range, and that the requirements of Listing 12.05(C) cannot be met.  With respect to Listing 12.05(B), Crittendon must demonstrate: "(1) subaverage intellectual

7

functioning; (2) onset before age 22; and (3) adaptive-skills limitations."

*Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 674 (6th Cir. 2009).[5]

Pertaining to the first two factors, Crittendon was found four times to have a qualifying IQ before the age of 22. First, in 2005 when he was twelve years old, Nick Boneff, Ph.D, assessed him with a verbal comprehensive index of 45, a perceptual reasoning index of 57, a working memory index of 59, a processing speed index of 56 and a full scale IQ of 45, in the moderately retarded range. [R. 10-7, Tr. 180]. Dr. Boneff opined that these IQ results were valid. [*Id.*, Tr. 181]. When Phillip Ross, MS, LLP, evaluated Crittendon in 2009, his verbal IQ was 59, his performance IQ was 60 and his full scale IQ was 59, and he was diagnosed with mild mental retardation. [*Id.,* Tr. 215-20].

Crittendon was again evaluated by Dr. Boneff in December 2011 for his reapplication, but Dr. Boneff did not review any previous records, including his own 2005 testing of Crittendon. [*Id.,* Tr. 189]. This time, Dr. Boneff assessed Crittendon with a verbal comprehension score of 66, a perceptual reasoning score of 69, a working memory score of 65, a processing speed score of 74, and a full scale IQ of 69. [*Id.,* Tr. 189-92].

---

[5] *Hayes* quoted a prior version of Listing 12.05 that used the term "mental retardation." *Hayes*, 357 F. App'x at 720-21. The current version substitutes "intellectual disability," but is otherwise the same.

But Dr. Boneff considered those results invalid because, "Once the formal IQ testing began [Crittendon] became more reticent, seemed to be bored, indifferent and it is this examiner's opinion, he was putting forth minimal effort and exaggerating his cognitive impairments."  [*Id.*, Tr. 190].

Crittendon's final IQ testing was performed by Paul Kaye, Ph.D, in February 2013.  [*Id.*, Tr. 294-97].  Dr. Kaye found Crittendon to have a verbal comprehension score of 66, a perceptual reasoning score of 67, a working memory score of 58, a processing speed score of 65 and full scale IQ of 58.  [*Id.*, Tr. 294].  He did not explicitly comment on the validity of the testing, but described Crittendon in a manner that suggests that he believed the testing was valid.  For example, Dr. Kaye wrote:

- "These deficits in reason, phonics, spelling, and math should be viewed as secondary feature of his primary diagnosis of Mental Retardation-mild in nature";

- "These test findings indicate that Baquan is consistently functioning within the Intellectually Deficient range in all four major domains of intellectual functioning"; and

- "Given his overall low cognitive functioning, he may require constant supervision, within an enclave setting or other form of supported employment."

[*Id.*, Tr. 295-97].  Dr. Kaye did not question the validity of the test results even though Crittendon "frequently appeared bored and

9

somewhat impatient"; he noted that Crittendon was "cooperative throughout the evaluation process."  [*Id.*, Tr. 294].

## C.

When finding the Crittendon did not meet Listing 12.05(B), the ALJ did not mention either his 2005 or 2009 testing results – an omission that Crittendon argues was erroneous.  The ALJ acknowledged that Crittendon received a full scale IQ score of 58 in February 2013, which is within Listing 12.05(B).  [R.10-2, Tr. 19].  However, because Dr. Kaye noted that Crittendon had appeared bored and impatient, the ALJ concluded that he "was not giving his best effort" and thus found that Crittendon did not have *valid* test scores within the range considered by the Listing 12.05(B).  [*Id.*]. Later in her opinion, the ALJ concluded that accurate intellectual functioning for Crittendon had "been tough to come by as the claimant has generally shown poor effort during testing, which skews the results." [*Id.,* Tr. 21].  This conclusion is not supported by substantial evidence.

Courts have rejected an ALJ's use of lay analysis to conclude that IQ scores were invalid when such a finding is inconsistent with the doctor's full evaluation. For example, in *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462 (6th Cir. 2012), the court noted that while the "ALJ may choose to disregard I.Q. scores that would normally lead to a finding of disability when

10

those scores were undermined by a doctor's full evaluation," the ALJ in that case had erred in disregarding IQ scores because the full evaluation "served to reinforce the I.Q. scores, rather than undermine them." *See also Henderson v. Comm'r of Soc. Sec.*, No. 13-11503, 2014 WL 3827227, at *11-12 (E.D. Mich. Aug. 4, 2014), report and recommendation adopted, No. 13-11503, 2014 WL 3864568 (E.D. Mich. Aug. 5, 2014) (citing *Dragon* and concluding, "The same is true here, where Henderson's IQ scores are both consistent with his results on previous IQ tests and with the remainder of Dr. Van Horn's evaluation."); *Conwell v. Comm'r of Soc. Sec.*, No. 1:14-CV-810, 2015 WL 9872213, at *5 (S.D. Ohio Dec. 2, 2015), report and recommendation adopted, No. 1:14CV810, 2016 WL 234813 (S.D. Ohio Jan. 20, 2016) (substantial evidence did not support invalidating IQ scores because, "As in *Dragon,* in the instant case Dr. Griffiths' complete evaluation only served to reinforce the validity of Plaintiff's IQ scores, rather than to undermine them.").

Here, Dr. Kaye observed that Crittendon appeared bored and impatient, but he also reported that Crittendon was cooperative throughout the testing, that he was consistently functioning within the Intellectually Deficient range in all four major domains of intellectual functioning, and that Crittendon's "cognitive deficits are consistent with the diagnosis of Mental

Retardation-Mild in nature."   [R. 10-7, Tr. 297].  The ALJ decision to

invalidate Crittendon's 2013 score was not supported by Dr. Kaye's full

evaluation.

Nor was it supported by Crittendon's childhood IQ tests; the ALJ did

not mention the 2005 and 2009 results that fell within Listing 12.05(B).  The

Commissioner argues that under the regulations for childhood mental

disorders, 20 C.F.R. Part 404, Subpt P, App'x 1 § 112.00(D)(10), IQ testing

is valid for only a limited time, and that the ALJ therefore did not need to

consider Crittendon's childhood testing.  The Commissioner made this

same argument in *Dragon*, and the Sixth Circuit specifically rejected it,

finding that when Listing 12.05 is at issue, childhood IQ scores and

diagnoses are specifically relevant in determining whether he had

subaverage intellectual functioning before the age of 22. *Dragon*, 470 F.

App'x at 460-61, and n. 2 (6th Cir. 2012).  The Commissioner has

nonetheless continued in cases pertaining to Listing 12.05 to press its

Listing 112.00 limitations argument, and district courts have repeatedly

followed *Dragon* in rejecting the argument and in finding the childhood IQ

scores to be relevant.  *Henderson*, 2014 WL 3827227 at *10 ("[T]he results

from these early IQ tests clearly are relevant to whether Henderson

satisfies the diagnostic description of Listing 12.05, i.e., whether he has

shown 'onset of the impairment before age 22.'"); *Vanover v. Colvin*, No. 3:14-CV-301, 2015 WL 4920138, at \*9 (E.D. Tenn. Aug. 12, 2015) ("[A]n older score was relevant to establish the manifestation of Dragon's impairment before the age of 22.").

So Crittendon's 2005 and 2009 scores were specifically relevant to his Listing 12.05 claim. And the fact that the childhood IQ scores were within the Listing 12.05(B) range further undermines the ALJ's decision to invalidate the 2013 IQ test results. *See Henderson*, 2014 WL 3827227 at \*11-\*12 (because doctor's full evaluation and childhood IQ scores were consistent with IQ score, ALJ's decision to find IQ score invalid was not supported by substantial evidence).

On the other hand, the ALJ's finding that Crittendon did not meet the requirements of Listing 12.05(C), which requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function, was supported by substantial evidence. Dr. Boneff stated that Crittendon's full scale IQ of 69 should be "considered invalid" and was "likely to be an under-estimate of [Crittendon's] actual ability." [R. 10-2, Tr. 190.]. *See Courter*, 479 F. App'x at 718 (ALJ properly discounted

sub-70 IQ score, in part, because examiner described it as an underestimate of claimant's abilities).

Having determined that the ALJ improperly rejected Crittendon's 2013 IQ, the next questions are whether the ALJ sufficiently addressed the third Listing 12.05(B) factor – Crittendon's level of adaptive functioning – and if so, whether her conclusions are supported by substantial evidence.

**D.**

"Adaptive functioning includes a claimant's effectiveness in areas such social skills, communication, and daily living skills." *West v. Comm'r. of Soc. Sec.,* 240 Fed. Appx. 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). The applicable regulation describes adaptive activities as pertaining to daily activities that include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." § 12.00(C)(1). These activities are evaluated for the purpose of identifying the claimant's level of independence. "In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of

14

supervision or direction." *Id.* In regards to social functioning, the regulation "refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." *Id.* It also includes "the ability to get along with others . . . communicate clearly with others[.]" *Id.* Although Listing 12.05 does not specify the necessary severity of the claimant's limitations of adaptive functioning, "case law from the Sixth Circuit and other federal courts suggests that a claimant must have relatively significant deficits to satisfy the Listing." *Farnsworth v. Comm'r of Soc. Sec.*, No. 2:13-CV-923, 2015 WL 1476458, at *9 (S.D. Ohio Mar. 31, 2015).

The ALJ did not directly address Crittendon's deficits in adaptive functioning when addressing Listing 12.05(B), but did assess Crittendon's activities of daily living, social functioning, and concentration, persistence or pace when analyzing Listing 12.05(D). She held that Crittendon has moderate difficulties with regard to social functioning; moderate difficulties with regard to concentration, persistence, or pace; and a mild restriction concerning activities of daily living. [R. 10-2, Tr. 19-20]. In explaining Crittendon's mild restrictions within daily living, the ALJ noted that Crittendon is able to groom himself, complete household chores, cook simple meals, travel independently, visit with friends, watch television and

15

play games.  [*Id.*, Tr. 19].  Regarding social functioning, the ALJ pointed out that Crittendon gets along well with family and friends but has had difficulty controlling his anger in the past.  [*Id.*, Tr. 20].  The ALJ also stated that in 2012, Crittendon denied having trouble with his social functioning.  [*Id.*]. Lastly, in regard to the ALJ finding that Crittendon has moderate difficulties with concentration, persistence or pace, the ALJ acknowledged Crittendon's attention deficit disorder diagnosis and that he appeared to be bored and disinterested during his intellectual functioning tests, which affected his concentration, persistence and pace.  [*Id.*].

Crittendon argues that he cannot independently or without difficulty perform many of the activities that the Commissioner listed. [R. 22, PgID 417; R. 23, PgID 422-423].  He claims that his mother still helps in "keeping the house up" where he lives with his sister.  [R. 23, PgID 3; R. 10-7, Tr. 296].  The Court, as did the ALJ, acknowledges that Crittendon has some difficulties regarding his daily activity and social functioning.  But there is substantial evidence to support the ALJ's determination that his difficulties fall short of being considered significant deficits in adaptive functioning.  "If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion."  *Cutlip*

16

*v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations and internal quotation marks omitted).

As early as 2005, Crittendon was able to bath and dress himself appropriately and independently, and complete household chores, including laundry and preparing simple meals.  [R. 10-7, Tr. 181].   Indeed, Crittendon's mother, in reference to his household chores, claimed that "he does pretty good but still needs a few reminders." [*Id.*, Tr. 184].  More recently, in 2012, his mother indicated that Crittendon could perform each activity of daily living independently, including eating, dressing, grooming, mobility in the community, and taking medication (though reminders were recommended).  [R. 10-7, Tr. 235].  He enjoyed playing video games, reading about sports and interacting with his family; took the bus to visit others and go out into the community; spent time with his friends and girlfriend; and went out to eat, bowl, to the zoo and to other community activities. [*Id.* at 232].  Crittendon had a driver's license and testified to having a car until he was in accident.[6]  [R. 10-2, Tr. 35-36].  At the time of the hearing, he had graduated from high school, lived with his sister and worked about sixteen hours per week as a janitor.  [*Id.*, Tr. 38-40].  These activities provide substantial evidence for the ALJ's determination that

---

[6] The accident was reportedly not his fault.  [R. 10-7, Tr. 296].

Crittendon did not have sufficient deficits in adaptive functioning to meet Listing 12.05(B).  *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (claimant who was able to cook, do laundry, use public transportation, shop, and manage finances did not have necessary deficits in adaptive functioning to meet Listing 12.05).

As Crittendon points out, he was in special education classes beginning in the third grade and received tutoring.  [R. 23, PgID 423, citing R. 10-7, Tr. 179, 216, 294].  But "neither circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two."  *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 540 (6th Cir. 2014).  Adaptive functioning and intellectual functioning are distinct considerations under Listing 12.05.  *Id.* Here, despite treating psychologist Phillip Ross recommending in 2010 that Crittendon continue with special education classes and tutoring, he found that Crittendon had only a mild deficit in his overall adaptive functioning. [R. 10-7., Tr. 219].  And despite questioning Crittendon's ability to work without supervision, Dr. Kaye's opinion was ultimately inconclusive with regard to his adaptive functioning abilities.  [*Id.*, Tr. 297].  Further, examining and reviewing psychologists consistently found that Crittendon

18

was capable of performing simple routine work. [*Id.*, Tr. 193-196, 189-192, 197-210, 272-275]. These reports support the ALJ's determination that Crittendon had insufficient deficits in adaptive functioning to meet Listing 12.05(B). *See Robinson v. Comm'r of Soc. Sec.,* No. 2:13-CV-530, 2014 WL 3419309, at *9 (S.D. Ohio July 10, 2014) (Listing 12.05 not met when doctors found that the plaintiff had mild or moderate deficits in adaptive functioning).

For these reasons, the ALJ's error in invalidating Crittendon's IQ full scale IQ score of 58 in 2013 was harmless, and the ALJ's decision should be affirmed.

## III.   CONCLUSION

The Court **RECOMMENDS** that the Commissioner's motion for summary judgment **[R. 12]** be **GRANTED**; that Crittendon's motion for summary judgment **[R. 16]** be **DENIED**; and the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: November 17, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page

20

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 17, 2016.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager